**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| FLOWSERVE US INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | No. 3:14-CV-1706-M |
| | § | |
| ITT CORP. and GOULD PUMPS, INC., | § | |
| | § | |
| Defendants. | § | |
| | § | |

**MEMORANDUM OPINION AND ORDER**

Before the Court is Defendants' Motion to Dismiss on *forum non conveniens*

grounds [Dkt. No. 14].  Having considered the pleadings, the Motion to Dismiss, the

Response, the Reply, the parties' other submissions, and the applicable law, the Court is

of the opinion that this case should be dismissed so that it may proceed in Russia.  The

Motion is **GRANTED**.

## I.    BACKGROUND

This is an action by Plaintiff Flowserve US Inc. ("Flowserve") against Defendants

ITT Corp. ("ITT") and Gould Pumps, Inc. ("GPI").[1]  Complaint ¶¶ 1–3.  Flowserve is a

worldwide leader in manufacturing and servicing flow-control systems for oil and gas

companies.  *Id.* ¶ 7.  Flowserve's place of incorporation is Delaware, and its principal

place of business is Texas.  *Id.*  ITT is one of Flowserve's competitors and also operates

worldwide.  *Id.* ¶¶ 31, 63.  ITT's place of incorporation is Indiana, and its principal place

---

[1] "The court recounts the pertinent evidence according to the standards that apply when it decides a motion to dismiss without conducting an evidentiary hearing. The court accepts as true the uncontroverted allegations of [plaintiff's] complaint and resolves in [plaintiff's] favor any factual conflicts posed by the parties' affidavits." *Am. Eyewear, Inc. v. Peeper's Sunglasses & Accessories, Inc.,* 106 F.Supp.2d 895, 897 n. 1 (N.D. Tex. 2000) (Fitzwater, J.) (citing *Latshaw v. Johnston,* 167 F.3d 208, 211 (5th Cir. 1999)).

of business is New York. *Id.* ¶ 2.  GPI, a wholly owned subsidiary of ITT, is incorporated

in Delaware, and its principal place of business is also New York.  *Id.* ¶ 3.[2]  All three

companies conduct significant business activities in Russia, which is where this dispute

initially arose.  *Id.* ¶¶ 14–16, 34.

In 2007, Flowserve sold 28 pipeline pumps to Moscow-based Vankor Oil LLC

("Vankor"), for use in Vankor's pipeline operations in Russia.  *Id.* ¶ 14.  Four years later,

Flowserve began negotiating with Neftegazholding to provide aftermarket services for

the pumps.  *Id.* ¶ 16.  Neftegazholding is a commercial agent that maintains pipeline-

pumping stations by using certified personnel and third-party vendors like Flowserve and

ITT.  *Id.* ¶ 15.

Jim Hamilton and Roman Korolyov conducted the negotiations on behalf of

Flowserve.  *Id.* ¶ 16.  Flowserve alleges that it and Neftegazholding contemplated, and

Flowserve approved, a two-year service agreement.  *Id.*  Flowserve alleges that in April

2012, Hamilton and Korolyov inexplicably agreed to a nine month service contract, even

though Neftegazholding had a contract with Vankor for 21 months.  *Id.* ¶ 17.  Flowserve

claims that Hamilton and Korolyov agreed to a shorter contractual period to later acquire

the Neftegazholding contract for what would soon become their new employer, ITT.  *Id.*

Hamilton announced his resignation from Flowserve in October 2012, and he joined ITT

in January 2013, shortly after Flowserve's service contract with Neftegazholding had

expired.  *Id.* ¶ 18.  Korolyov did the same in February 2013.  *Id.*

Flowserve asserts that, shortly after Korolyov's departure, one of its Moscow-

based employees, Andrei Mikhailichenko, accessed, downloaded, and unlawfully copied

---

[2] In its Complaint, Flowserve makes no specific allegations against GPI, nor does it plead specific facts
pertaining to GPI, with the exception of the jurisdictional facts set forth in Paragraphs 3 and 5.

Flowserve's confidential, proprietary, and copyrighted product drawings from its server in Michigan. *Id.* ¶¶ 19, 23. Mikhailichenko allegedly copied 265 drawings ("the Drawings") over a 37-day period before he resigned from Flowserve and joined ITT. *Id.* ¶ 19. Flowserve claims that Mikhailichenko copied the Drawings onto a CD-ROM or DVD and then later downloaded them onto ITT's server. *Id.* ¶ 25. Flowserve contends that unauthorized copies of the Drawings were made within the United States, on Flowserve's server and computer systems, to transmit them to Moscow. *Id.* ¶ 23.

According to Flowserve, the Drawings disclosed the design of the custom pumps it had built for Vankor, and a possessor of the Drawings would thus have a distinct advantage in bidding on the service contract for the Vankor pumps. *Id.* ¶ 20–21. Without the Drawings, Flowserve asserts that it would be nearly impossible for anyone to reliably service and maintain the Vankor pumps. *Id.* ¶ 21.

Around the same time Hamilton joined ITT, eight other Flowserve employees in Russia requested service technician training for the Vankor pumps. *Id.* ¶ 26. The training took place in the Netherlands from February to March 2013. *Id.* ¶¶ 27–29. Flowserve trained and certified these employees, and as part of their training, the eight employees received proprietary and confidential information, including how the pumps are designed, operated, and maintained. *Id.* Immediately after they returned to Russia, those employees resigned from Flowserve and accepted positions with either ITT or Neftegazholding. *Id.* ¶ 32.[3] Flowserve alleges that the training provided by Flowserve to its former employees would give their new employer a distinct advantage in bidding on a service contract for the Vankor pumps. *Id.* ¶ 30. Flowserve also claims that its former

---

[3] Flowserve claims that Korolyov was waiting for the returning employees at the Moscow airport, where he allegedly asked them to sign resignation letters and accept positions with either ITT or Neftegazholding to provide services for Vankor. Complaint ¶ 32.

employees use the Flowserve training and credentials they obtained from Flowserve in soliciting business for ITT. *Id.* ¶ 36.

Neftegazholding decided not to renew Flowserve's service contract for the Vankor pumps, and instead awarded a contract to ITT. *Id.* ¶ 34. Flowserve alleges that Hamilton induced Mikhailichenko and others to leave Flowserve and bring their know-how and the Drawings to ITT as part of his effort to improperly acquire the contract to service the Vankor pumps. *Id.* ¶¶ 38, 41. Although ITT later terminated Mikhailichenko, he was subsequently hired by Neftegazholding to continue working on the contract with ITT for service on the Vankor pumps. *Id.* ¶ 37.

In August 2013, Flowserve's general counsel contacted her counterpart at ITT to ask that the Drawings be returned, and requested that Flowserve's proprietary and confidential information not be used by ITT to keep or obtain contracts. *Id.* ¶ 45. Flowserve claims that, in March 2014, ITT's new general counsel admitted that ITT had the Drawings, but declined to return them unless Flowserve released potential claims against ITT. *Id.* ¶ 49.

## II.   PROCEDURAL HISTORY

On May 8, 2014, Flowserve filed this lawsuit, alleging copyright infringement, unfair competition, replevin, conversion, tortious interference with contractual relations and prospective contractual relations, and misappropriation of trade secrets. Dkt. No. 1. On August 18, 2014, Defendants filed a Motion to Dismiss on forum non conveniens grounds, arguing that Russia is an available and adequate forum, and that private and public interests factors favor dismissal. Dkt. No. 14. On September 15, 2014, Flowserve filed a Motion for a Preliminary Injunction. Dkt. No. 22. The parties entered into a

stipulation partially mooting Flowserve's request for injunctive relief pending the Court's

determination of Defendants' Motion to Dismiss.  Dkt. No. 37.

### III.    LEGAL STANDARD

The Supreme Court clearly set out in *Piper Aircraft Co. v. Reyno* the required

forum non conveniens analysis when a party claims another nation is a more appropriate

forum.  454 U.S. 235 (1981).  The court must first decide whether there is an available

and adequate alternative forum, which means the forum must have personal jurisdiction

over the defendant and provide the plaintiff with adequate remedies.  *See id.* at 254–55.

If such a forum exists, the court must then decide which forum is preferable to

host the litigation.  *Id.* at 255.  To guide its decision, the court considers whether certain

private and public interest factors weigh in favor of dismissal, while keeping in mind that

the "ultimate inquiry is where trial will best serve the convenience of the parties and the

interests of justice."  *DTEX, LLC v. BBVA Bancomer, S.A.*, 508 F.3d 785, 794 (5th Cir.

2007) (citations omitted).  Defendants bear the burden of proof on all elements of the

forum non conveniens analysis.  *Id.*

The private interest factors are:

(i) the relative ease of access to sources of proof; (ii) availability of compulsory
process for attendance of unwilling, and the cost of obtaining attendance of
willing, witnesses; (iii) possibility of view of the premises, if view would be
appropriate to the action; (iv) all other practical problems that make trial of a case
easy, expeditious and inexpensive.  *Id.*

The public interest factors are:

(i) the administrative difficulties flowing from court congestion; (ii) the local
interest in having localized controversies resolved at home; (iii) the interest in
having the trial of a diversity case in a forum that is familiar with the law that
must govern the action; (iv) the avoidance of unnecessary problems in conflicts of
law, or in application of foreign law; and (v) the unfairness of burdening citizens
in an unrelated forum with jury duty.  *Id.*

A plaintiff's choice of forum is usually afforded a strong favorable presumption, but that presumption is certainly not dispositive, especially when the litigants engage in extensive international commerce.  *See Piper Aircraft*, 454 U.S. at 255–56; *DTEX*, 508 F.3d at 795.  Instead, "[w]hen an American corporation doing extensive foreign business brings an action for injury occurring in a foreign country, many courts have partially discounted the plaintiff's preference of a United States forum." *DTEX*, 508 F.3d at 795.

"The *forum non conveniens* determination is committed to the sound discretion of the trial court.  It may be reversed only when there has been a clear abuse of discretion; where the court has considered all relevant public and private interest factors, and where its balancing of these factors is reasonable, its decision deserves substantial deference." *Piper Aircraft Co.*, 454 U.S. at 257.

## IV.    ANALYSIS

### A.  The Evidence Before the Court

Defendants submitted the following evidence:  a declaration from Tatiana Elovskaya, the Human Resources Manager at ITT Industries Russia LLC; a declaration from Lori B. Marino, the Vice President, Deputy General Counsel, and Corporate Secretary at ITT; a declaration from Joanne Scalard, Vice President, Secretary, and General Counsel of GPI; [4] an expert opinion from Vladimir Vladimirovich Yarkov, head of the Civil Procedure Department at Urals State University; and an expert opinion from A.P. Sergeyev, a professor of the Civil Law Department of the Faculty of Law of St. Petersburg University of Economics.

---

[4] Marino and Scalard state that they are each authorized to bind ITT and GPI, respectively, to litigation positions, and that both ITT and GPI consent to jurisdiction in Russia for any similar claims brought by Flowserve in that forum.  Def.'s App. 5, 7.

Flowserve submitted the following evidence:  an expert opinion from Boris

Romanovich Karabelnikov, a professor of law at the Moscow School of Social and

Economic Sciences; and an expert opinion from Eduard P. Gavrilov, a professor at the

Civil Law Department of the National Research University "Higher School of

Economics."[5]

### B.  The Availability and Adequacy of the Foreign Forum

### 1.      Russia is an available forum.

To be considered available, a foreign forum must be able to exercise jurisdiction

over the entire case and all the parties.  *DTEX*, 508 F.3d at 796.  A forum is available for

the purposes of a forum non conveniens analysis when each of the defendants agree to

submit to the jurisdiction of the alternative forum.  *Veba-Chemie A.G. v. M/V Getafix*,

711 F.2d 1243, 1245 (5th Cir. 1983).  Here, Defendants have consented to jurisdiction in

Russia, which makes that forum available.  Def.'s App. 5 (Decl. of Lori B. Marino);

Def.'s App. 7 (Decl. of Joanne Scalard); *see also Base Metal Trading SA v. Russian

Aluminum*, 253 F.Supp.2d 681, 698 (S.D.N.Y. 2003) (finding Russia to be an available

forum where all twenty defendants explicitly consented to jurisdiction in Russia).

Flowserve argues that it has not consented to jurisdiction in Russia and that

Defendants have failed to show that consent is a proper basis for personal jurisdiction

under Russian law.  Flowserve also argues Defendants have not shown that the proposed

---

[5] Defendants ask the Court to disregard five excess pages in Flowserve's Response because its brief exceeded the 25-page limit set forth in Local Rule 7.2(c), and it did not seek leave to do so.  Def.'s Reply at 1 n. 1.  Because Defendants have the burden of showing dismissal is proper and pages 25–30 of Flowserve's Response largely argues matters otherwise raised in the expert opinions of Professor Karabelnikov and Professor Gavrilov, the Court declines to disregard those pages and retroactively, *sua sponte*, grants Flowserve leave to exceed the page limit.  In the future, counsel for Flowserve are advised to seek leave before exceeding the page limits provided by the local rules.

forum, the Russian Arbitrazh Court, would have subject matter jurisdiction over each of Flowserve's claims.[6]

Even if consent were an insufficient basis for personal jurisdiction, Article 247 of the Arbitrazh Procedural Code (APC) provides other grounds for the Russian court to exercise personal jurisdiction over Defendants.[7]  As Professor Yarkov explains, Article 247 of the APC authorizes arbitrazh courts to hear disputes involving foreign entities where (1) a party has a branch or representative office in Russia; or (2) the claim arises from an action or other circumstances occurring in Russia, or where the harm is suffered in Russia.  Def.'s App. 11 (Yarkov Op.).

Professor Yarkov explains that, to satisfy the branch or representative office requirement, there must be a link between the Russian office and the parties' dispute.  *Id.* at 12.  Here, the employees who allegedly took confidential and proprietary information were employed by Flowserve's Russian offices and allegedly recruited to ITT's Russian offices.  Complaint ¶ 32.  Moreover, Mikhailichenko allegedly copied the Drawings while working for Flowserve in Moscow.  *Id.* ¶ 19.  These facts appear to be sufficient to establish a link between the Russian offices of the parties and this dispute, satisfying Article 247(1) of the APC.  *See* Def.'s App. 12 (Yarkov Op.).

The Complaint also makes it clear that if Defendants harmed Flowserve, they did so through their actions in Russia.  ITT's current and former employees allegedly misappropriated confidential and proprietary information from Flowserve's Moscow office and transferred the information to ITT's Moscow office.  Complaint ¶ 25, 32.

---

[6] Flowserve's argument regarding subject matter jurisdiction is better suited for the analysis of whether the forum is adequate, not whether the forum is available.  The issue of availability focuses only on whether the parties are amenable to service of process.  *See Piper Aircraft*, 454 U.S. at 254–55 n. 22.

[7] Flowserve's own expert, Professor Karabelnikov, appears to concede that the jurisdictional inquiry is limited to the location of the *defendant* and the *defendant's* property.  Pl.'s App. 49 (Karabelnikov Op.).

Mikhailichenko, who remained in Russia, downloaded the Drawings using a computer in Russia, which he was apparently authorized by Flowserve to do. *Id.* ¶ 19, 22, 25.  It was only when he made copies of the Drawings and took them to ITT that he allegedly misappropriated Flowserve's trade secrets and infringed its copyrights. *Id.* ¶ 19.

Because the primary unlawful activities took place in Russia, Article 247(2) of the APC is satisfied, and an arbitrazh court would have personal jurisdiction over Defendants. *See* Def.'s App. 12 (Yarkov Op.).  Even if consent were an insufficient means of establishing jurisdiction in Russia, which this Court finds unlikely to be so, ITT and GPI would still be subject to the jurisdiction of an arbitrazh court pursuant to Article 247 of the APC.

Professor Karabelnikov argues that ITT cannot be subject to the jurisdiction of an arbitrazh court because, even if the parties satisfy Article 247 of the APC, they must also satisfy Articles 35 and 36, which set forth other rules of personal jurisdiction.  Pl.'s App. 49 (Karabelnikov Op.).[8]  Many of Professor Karabelnikov's conclusions are premised on Flowserve's instructions to him that it was ITT's Russian subsidiary that committed the alleged harm in Russia, not ITT itself.  *See id.* at 49–52.  However, Flowserve's Complaint brings claims only against ITT and GPI, not any other Russian entity.  *See* Complaint ¶¶ 25–26, 45–49.  Flowserve contacted the general counsel of ITT when it sought to retrieve the Drawings and reach an agreement about ITT's use of the Drawings in Russia, and ITT's counsel responded.  *Id.* ¶ 45.

---

[8] It is unclear how Articles 35 and 36 of the APC impact the jurisdictional analysis.  The case cited by Professor Karabelnikov involved a foreign borrower and a Russian lender.  Pl.'s App. 50 (Karabelnikov Op.).  The Russian court of appeals instructed the Russian claimant to apply to the arbitrazh court in Moscow, rather than another arbitrazh court.  *Id.*  In other words, the appeals court let the action go forward in a different Russian venue.  *Id.*  This case hardly demonstrates that the foreign borrower was dismissed for lack of personal jurisdiction.  In fact, Karabelnikov admits only that a claimant "may have difficulties with determination of a court of first instance of an appropriate jurisdiction." *Id.*

The Court must assume that Defendants, ITT and GPI, are the real parties in interest, which means Article 247(2) is satisfied. If the real party in interest is an ITT Russian subsidiary that Flowserve sought to join, the claims against it could likely be dismissed for lack of personal jurisdiction because of a lack of minimum contacts with this forum.[9]

### 2.  Russia is an adequate forum.

To be adequate, the alternate forum must not deprive the parties of all remedies or treat them unfairly. Adequacy does not require that the parties be provided with all of the benefits of an American court. *DTEX*, 508 F.3d at 796. There is a presumption that the substantive law of the foreign forum is adequate, unless the plaintiff can show "conditions in the foreign forum . . . plainly demonstrate that the plaintiff is highly unlikely to obtain basic justice there." *Id.* In fact, the Fifth Circuit has stated that "a forum is inadequate only where it would afford a plaintiff no remedy at all." *Kempe v. Ocean Drilling & Exploration Co.*, 876 F.2d 1138, 1146 (5th Cir. 1989).

Defendants argue that U.S. courts have routinely found Russia to be an adequate forum for the types of claims asserted in this case. *See, e.g.*, *Overseas Media, Inc. v. Skvortsov*, 441 F.Supp.2d 610, 612, 618 (S.D.N.Y. 2006) (holding Russia to be an adequate forum for an action alleging federal copyright infringement); *Base Metal Trading SA*, 253 F.Supp.2d at 700 ("Russian law also provides causes of action equivalent to conversion and intentional interference with contract."); *RIGroup LLC v.*

---

[9] The same problem arises with respect to Flowserve's argument that, although Flowserve owns the copyrights at issue, only a nonparty, "OOO Flowserve" operates in Russia, and only it of the Flowserve entities is subject to jurisdiction there. The Complaint is bereft of any reference to OOO Flowserve, and instead asserts that Flowserve U.S. Inc. owns the copyright, operates a Quick Response Center in Moscow, and employed thirteen workers in Russia who later resigned and joined ITT and Neftegazholding. *See* Complaint ¶¶ 12, 19, 42, 56.

*Trefonisco Management Ltd.*, 949 F.Supp.2d 546, 549, 554 (S.D.N.Y. 2013) (finding

Russia to be an adequate forum for an action alleging conversion, fraud, conspiracy to

defraud, and breach of fiduciary duty).

Russia has apparently recently established a special Court on Intellectual Rights

that provides copyright protections.[10]  Def.'s App. 44 (Sergeyev Op.).  Both Russia and

the United States are signatories to the Universal Copyright Convention and the Berne

Convention for Protection of Literary and Artistic Works, which require each signatory to

apply other signatories' foreign copyright laws, when applicable.  *See Indusoft, Inc. v.*

*Taccolini*, 560 F. App'x 245, 250 (5th Cir. 2014) (upholding dismissal, in part, because

both Brazil and the United States are signatories to the Berne Convention and Universal

Copyright Convention); *see also Itar-Tass Russian News Agency v. Russian Kurier, Inc.*,

153 F.3d 82, 90–91 (2d Cir. 1998); 5 Melville B. Nimmer & David Nimmer, *Nimmer on*

*Copyright* §§ 17.01, 17.04 (Matthew Bender, Rev. Ed. 2014).

Flowserve's experts, Professors Karabelnikov and Gavrilov, do not argue that

Flowserve would be deprived of all remedies by the arbitrazh court, nor do they show

that the parties would necessarily be treated unfairly in Russia.  Professor Gavrilov

concludes that Flowserve's trade secret claims would be strictly limited, because Russian

courts "take a purely formal approach" with respect to the infringement of so-called

"know how" rights.  Pl.'s App. 165 (Gavrilov Op.).  According to Professor Gavrilov, to

prevail a claimant must have marked the relevant know-how as a "Commercial Secret" in

order to bring a claim.  Pl.'s App. 165–66 (Gavrilov Op.).  Even if the adequacy analysis

hinged on whether Flowserve could bring a know-how claim—and it does not—this

---

[10] According to Professor Sergeyev, the Court on Intellectual Rights has already considered several
thousand cases since its inception in July 3, 2013.  Def.'s App. 44 (Sergeyev Op.).

marking requirement does not establish that Flowserve would be unable to bring such a claim.  The record is unclear about whether Flowserve marked the Drawings and training materials as "Commercial Secrets."  *See* Complaint ¶ 24.

Professor Gavrilov also concludes that Flowserve would be unable to bring claims in Russia for conversion or replevin because a recent amendment to Article 1227 of the Russian Civil Code makes claims for conversion and replevin inapplicable to intellectual property rights.  Pl.'s App. 165 (Gavrilov Op.).  Presumably this is because a potential conversion or replevin claimant can instead assert claims for copyright infringement or know-how infringement.  *See* Def.'s App. 44–47 (Sergeyev Op.).

Flowserve argues that its remedies would be severely limited under Russian law. Professor Gavrilov maintains that damages are rarely recoverable because they are difficult to prove, and courts require documents about a defendant's business that are usually unobtainable by a plaintiff.  Pl.'s App. 166 (Gavrilov Op.).  However, Flowserve has not demonstrated that ITT would be unwilling to provide such documentation, nor does Flowserve dispute that Russian courts can and do compel the production of documents under certain circumstances.  *See* Def.'s App. 21 (Yarkov Op.); Pl.'s App. 56–57 (Karabelnikov Op.).  Moreover, Flowserve concedes that "alternative remedies" are available, but argues that the caps on such remedies make them insufficient.  A damages cap is not, by itself, a reason to find a forum inadequate if other relief is available to make a party whole.  *See DTEX*, 508 F.3d at 797 (finding Mexico to be an adequate forum even if Mexican law limits some categories of damages).

Finally, Flowserve argues that Russian courts are inadequate because discovery is limited, witness testimony is restricted, jury trials are nonexistent, and Russian judges are

underpaid and captive to special interests.  These arguments have not been well received

by other courts.  *See Blanco v. Banco Industrial de Venezuela, S.A.*, 997 F.2d 974, 982

(2d Cir. 1993) (stating that "some inconvenience or the unavailability of beneficial

litigation procedures similar to those available in the federal district courts does not

render an alternative forum inadequate") (internal citations and quotations omitted); *see

also Satz v. McDonnell Douglas Corp.*, 244 F.3d 1279, 1283 (11th Cir. 2001); *Logan

Int'l Inc. v. 1556311 Alberta Ltd.*, 929 F.Supp.2d 625, 633 (S.D. Tex. 2012) (finding that

the absence of a right to a jury trial does not render a forum inadequate and Canadian

courts' limited ability to order the production of documents relates to the private interest

factors); *RIGroup LLC*, 949 F.Supp.2d at 555 (stating that plaintiffs could not find a

single case in which corruption rendered Russia inadequate as an alternative forum).

Although Flowserve persuasively argues why it would prefer to be in this Court, it

has not established that conditions in Russia plainly show that it is highly unlikely to

obtain basic justice there, nor that it will be altogether deprived of a remedy.  *See Kempe*,

876 F.2d at 1146.  This Court thus finds the Russian arbitrazh court adequate for the

purposes of the forum non conveniens analysis.  *See In re Air Crash Disaster Near New

Orleans, Louisiana,* 821 F.2d 1147, 1165 (5th Cir. 1987), *vacated and remanded on other

grounds sub nom. Pan American World Airways, Inc. v. Lopez*, 490 U.S. 1032 (1989).

### C.  The Private Interest Factors

#### 1.  Ease of Access to Sources of Proof

The crux of the parties' dispute over the first private interest factor is whether the

majority of witnesses and documents are located in Russia, the United States, and/or

elsewhere.  Defendants argue that twelve of the thirteen former Flowserve employees

whose conduct is at issue are Russian citizens who still reside in Russia.  Def.'s App. 2–4 (Elovskaya Decl.).  The other employee, Jim Hamilton, resides in the United Kingdom, but still works in Russia.  *Id.* at 2.  Additionally, nonparties Vankor and Neftegazholding are in Russia and also likely possess relevant evidence.  Complaint ¶¶ 14–15.

Flowserve counters that only seven of the twelve Russian citizens are likely to be deposed, and that eleven of the twelve remain ITT employees, although Mikhailichenko is no longer employed by ITT.  Flowserve argues that other witnesses are in the Netherlands, Spain, Texas, Michigan, and New York, some of whom investigated the alleged misappropriation of the Drawings and the departure of the employees. Flowserve also claims that the majority of discoverable evidence is producible by ITT and Flowserve, and that any discovery related to Vankor and Neftegazholding will be very limited.

Most of the witnesses with relevant testimony do not reside in the United States. Flowserve alleges that Jim Hamilton was the ringleader of the mass exodus of employees from Flowserve to ITT.  *See* Complaint ¶ 38.  He still works for ITT and spends significant time in Russia.  Def.'s App. 2 (Elovskaya Decl.).  Additionally, Mikhailichenko's alleged copying of the Drawings constitutes the basis for many of Flowserve's claims, and he is now an employee of Neftegazholding, residing and working in Russia.  Complaint ¶¶ 25, 34, 37.  The other eleven ex-employees are Russian citizens who reside in Russia.  Def.'s App. 2–4 (Elovskaya Decl.).  In contrast, Flowserve identified only nine relevant witnesses residing outside of Russia, including Hamilton. *See* Pl.'s Resp. at 15.

Although it may be that some of Flowserve's ex-employees have limited or cumulative knowledge relevant to this dispute, it appears unlikely that more relevant or knowledgeable witnesses are *outside* of Russia.  Furthermore, it strikes the Court as unusual for Flowserve to declare that half of the ex-employees it chose to name in its Complaint have only non-relevant, cumulative knowledge.  Flowserve's identified potential witnesses residing outside Russia, including those who conducted training in the Netherlands and those that conducted the investigation after the employees left, simply do not outweigh the significance of the individuals residing or working in Russia.  Furthermore, Flowserve's claims and potential damages derive from its prospective relationship with Vankor and Neftegazholding, both Russian entities.

Defendants also argue that the majority of relevant documents are in Russia, including documents related to the decisions of ex-Flowserve employees to leave Flowserve, and other human resources documents that are in Russian.  Def.'s App. 4 (Elovskaya Decl.).  Flowserve counters that the Drawings are in Michigan, the later correspondence between the parties' respective general counsels about the return of the Drawings occurred in the United States, and that the training documents are in the Netherlands and Texas.  Flowserve also argues that the fact the parties are U.S. corporations enables them to produce all of the relevant documents, including those in Russia, using the normal discovery mechanisms under the Federal Rules of Civil Procedure.

Most of the documents relating to Flowserve's former employees are located in Russia, and would be costly to obtain and translate in this forum.  *See* Def.'s App. 4 (Elovskaya Decl.); *see DTEX*, 508 F.3d at 799 (finding that most of the documents were

in Spanish, and that obtaining and translating them would be burdensome, time-consuming, and costly in Texas).  Although it may be that the parties can produce many of the relevant documents in this forum under the Federal Rules of Civil Procedure, that does not mean it would be less costly or burdensome to do so.  The documents possessed in Russia by ITT, Flowserve, Neftegazholding, and Vankor suggest otherwise. Moreover, the after-the-fact correspondence between the parties' counsel does not materially impact the Court's finding, even assuming that such correspondence would be discoverable.   Having considered the location of relevant witnesses and documents, the Court finds that the ease of access to sources of proof factor weighs in favor of dismissal.

### 2.  Availability of Compulsory Process for Unwilling Witnesses

Defendants argue that this Court has no means to compel nonparties in Russia to testify or produce evidence here, and as a result, Defendants will be prejudiced because Neftegazholding, Vankor, Mikhailichenko, and other ex-Flowserve employees are Russian nonparties with relevant evidence.

According to the United States Department of State:

> The United States has not accepted the Russian Federation's accession to the Hague Convention on the Taking of Evidence Abroad in Civil and Commercial Matters because the Russian Federation did not name a central authority at the time of its accession, and did not make any specific declarations or reservations regarding methods of obtaining evidence.   Due to the Russian Federation's unilateral suspension of judicial cooperation in civil and commercial matters, requests for evidence submitted via diplomatic channels in the form of letters rogatory generally are not executed by Russian authorities.[11]

---

[11] "Legal Considerations," U.S. DEPARTMENT OF STATE, http://travel.state.gov/content/travel/english/legal-considerations/judicial/country/russia-federation.html (follow "Bureau of Consular Affairs" hyperlink; then follow "Legal Considerations" hyperlink; then follow "International Judicial Assistance" hyperlink; then follow "Russia" hyperlink; then follow "Russia" hyperlink; then follow "Obtaining Evidence in Civil and Commercial Matters" hyperlink).

The inability of this Court to compel nonparties to testify or produce relevant evidence poses a significant obstacle to this case proceeding in this forum because Vankor, Neftegazholding, and Mikhailichenko are all nonparties with relevant, and potentially crucial, evidence.  *See* Complaint ¶¶ 34–35, 44.  Professor Yarkov states that Russian courts can compel these same nonparties to participate in proceedings in Russia.  Def.'s App. 9, 19–20 (Yarkov Op.) (explaining that Art. 66 of the APC provides a party with a means to demand evidence from nonparties).

Rather than dispute that this Court cannot compel unwilling Russian witnesses to participate in this action, Flowserve argues that nonparty discovery will be of limited importance in this case because ITT and Flowserve have the "core discovery," and Flowserve assumed the risk of limited nonparty discovery when it chose this forum.  Pl.'s Resp. at 14.  Flowserve also argues that Russian courts are unlikely to grant nonparty discovery, and if they do so, the discovery will be severely restricted.[12]

The Court is not persuaded by Flowserve's argument that nonparty discovery will be of limited importance in this case.  Defendants have identified at least three nonparties whose testimony and evidence appears to be of critical importance.  *Compare Tempur-Pedic Int'l, Inc. v. Go Satellite, Inc.*, 758 F.Supp.2d 366, 381 (N.D. Tex. 2010) (finding that the availability of compulsory process factor did not favor either side where defendants only identified one relevant nonparty in the alternative forum).  Furthermore, a Russian court's limited means to compel nonparties to testify still outdoes this Court's

---

[12] Professor Karabelnikov also states, "principles of international comity promulgated by the Supreme Arbitrazh Court allow the Russian arbitrazh courts to collect evidence from Russia at the request of a US court even in the absence of a corresponding treaty."  Pl.'s App. 56– 57 (Karabelnikov Op.).  However, Karabelnikov fails to explain how principles of comity will prevail in light of Russia's unilateral suspension of judicial cooperation in civil and commercial matters, nor does he explain how frequently such collections are executed.  *See supra* p. 15.

essentially non-existent means of compelling Russians to testify in this case. *See RIGroup*, 949 F.Supp.2d at 556 (finding that the court lacked authority to compel the testimony of nonparty Russian witnesses); *see also Base Metal Trading*, 253 F.Supp.2d at 710. The forum non conveniens analysis ultimately determines "where trial will best serve the convenience of the parties *and the interests of justice*." *In re Air Crash*, 821 F.2d at 1162 (emphasis added). Therefore, it is not enough for Flowserve to assume the risk of limited nonparty discovery when the interests of justice would be better served by obtaining evidence from Vankor, Neftegazholding, and Mikhailichenko. Finally, Flowserve will presumably still be able to conduct its "core discovery" of ITT by taking witness depositions in Russia, or if Russian law does not permit such depositions, they may be taken in the United States.

As a result, the Court finds that this factor weighs heavily in favor of dismissal. *See DTEX*, 508 F.3d at 800 ("The inability to compel the attendance of numerous unwilling witnesses weighs heavily in favor of dismissal.").

### 3. Cost of Securing the Attendance of Willing Witnesses

Because a majority of the witnesses with the most relevant information reside abroad, the Court finds that securing their attendance in the United States would be more expensive than if this case were litigated in Russia. Flowserve argues that dismissing the action to Russia will merely shift costs from Defendants to Flowserve. While this is true to a limited degree, the fact of the matter remains that most of the willing witnesses reside and work in Russia. Although it may be the case that some witnesses with relevant information reside in the United States, international disputes are inevitably costly to litigate, and the evidence before the Court shows that such costs can be mitigated to a

greater extent if this action were brought in Russia.  Therefore, the Court finds that this factor weighs in favor of dismissal.  *See DTEX*, 508 F.3d at 800 (finding that the large number of Mexican witnesses in the case, many of whom were in different locations within Mexico, added to the cost of securing their attendance).

### 4.  Ability to View the Premises

The Court does not find that a view of the pumps or other equipment will be necessary to resolve this dispute.  As a result, this factor is neutral.

### 5.  Other Practical Factors

Defendants argue that most of the potential witnesses speak Russian and most of the documents are written in Russian.  Therefore, Defendants contend that employing interpreters and translating documents would make litigation burdensome in this forum.  Defendants also explain that the Russian Federation does not participate in the visa waiver program, and visas are hard for Russian citizens to obtain.[13]  These difficulties will impact twelve of the thirteen Russian employees named in Flowserve's Complaint.  *See* Def.'s App. 2–4 (Elovskaya Decl.).  The same language and travel barriers will probably also hinder Neftegazholding and Vankor employees, including Mikhailichenko, from coming to the United States.  Flowserve responds that dismissal will delay resolution of this case, and that both parties will also incur substantial expenses translating and litigating in Russia.

Here, the evidence shows that the difficulties inherent to translating documents and providing Russian interpreters weigh in favor of dismissal.  Flowserve's argument

---

[13] "Visa Waiver Program," U.S. DEPARTMENT OF STATE, http://travel.state.gov/content/visas/english/visit/visa-waiver-program.html (follow "Bureau of Consular Affairs" hyperlink; then follow "U.S. Visas" hyperlink; then follow "Tourism and Visit" hyperlink; then follow "Visa Waiver Program" hyperlink; see list of VWP designated countries).

that the same difficulties will arise in Russia ignores the Court's task—to determine which forum would be *more* practical. The record suggests that, if the case proceeds in this forum, most of the relevant documents will require English translations and most of the relevant witnesses will require interpreters. Conversely, if the case proceeds in Russia, fewer documents will require Russian translations and fewer relevant witnesses will require interpreters. Because many of the relevant documents will be in Russian and most of the relevant witnesses will be Russian, the Court finds that a Russian forum would be more practical than this forum.

### D. The Public Interest Factors

If the private factors weigh in favor of dismissal, then the Court may end its inquiry and decline to analyze the public factors. *Baumgart v. Fairchild Aircraft Corp.*, 981 F.2d 824, 837 (5th Cir. 1993) (explaining that a court need not consider certain public interest factors if there is an appropriate alternative forum and the private factors weigh in favor of dismissal); *see also In re Air Crash Disaster*, 821 F.2d at 1164. The public interest factors include: "(i) the administrative difficulties flowing from court congestion; (ii) the local interest in having localized controversies resolved at home; (iii) the interest in having the trial in a forum that is familiar with the law that must govern the action; (iv) the avoidance of unnecessary problems in conflicts of law, or in application of foreign law; and (v) the unfairness of burdening citizens in an unrelated forum with jury duty." *DTEX*, 508 F.3d at 802. Although the private interest factors support dismissal, the public interest factors add further support.

### I.    Administrative Burdens

Defendants argue that trying this dispute in Texas would create significant administrative difficulties because doing so will require bringing many witnesses from Russia, translating documents, and providing interpreters.  In short, Defendants argue the language barriers and distance between most of the evidence and this Court will make case management difficult.  Flowserve disputes that the majority of evidence is in Russia and argues that dismissal will not ease the administrative burden, but only shift it to Russia.  Flowserve also argues that Russian courts are so congested that they nearly deprive litigants of due process because each judge handles 58 cases per month, and as a result, Russian courts are only given three months from filing to render a judgment in complicated matters.  Pl.'s App. 57–59 (Karabelnikov Op.).  According to Flowserve, only .0165% of cases filed in Russian courts involve foreign litigants and non-Russian transactions, which means Russian judges unfamiliar with foreign law.  *Id.*  Also, the head of the arbitrazh court has admitted Russian judges lack independence.  Pl.'s App. 59 (Karabelnikov Op.).

The administrative burdens weigh in favor of dismissal when the evidence will be difficult to obtain, there is a history of litigation between the parties in the alternative forum, and foreign law will likely be applied.  *See DTEX*, 508 F.3d at 802; *see also Saqui v. Pride Cent. America, LLC*, 595 F.3d 206, 214 (5th Cir. 2010) (finding the administrative burdens supported dismissal where Mexican law governed claims regarding deaths of Mexican nationals in Mexican waters).  Here, at least some of the evidence will be difficult to obtain because it is in the hands of nonparties Mikhailichenko, Vankor, and Neftegazholding.  Although the record does not show that

Flowserve and Defendants have shared litigation history in Russia, Russian law may very likely apply to this dispute.

On the other hand, Flowserve argues that Russian courts are overly congested and, as a result, they expeditiously dispose of cases that might otherwise require extra time to make sure justice is served. There is no evidence that Russian courts' dockets are any more or less congested than is this Court's docket. Moreover, Russian judges' familiarity with American law is presumably no different from than this Court's familiarity with Russian law. Therefore, the Court finds that the administrative burdens factor is neutral.

## II.     Interest of the Forum in Resolving the Controversy

Defendants argue that this dispute is based in Russia, and that nothing significant occurred in the U.S. except that the Drawings were stored on Flowserve's server in Michigan. Flowserve counters that, because it is headquartered in Irving, Texas and ITT is headquartered in New York, and the training was provided in the Netherlands, this forum still has a significant interest in resolving the controversy, or at least a more significant interest than does Russia.

Accepting Flowserve's argument would require most litigation involving multinational corporations headquartered in the U.S. to be resolved in U.S. courts. Where the actors, property, and harm suffered are primarily connected to Russia, and not the United States, this forum has a minimal interest in resolving this dispute, even if the litigants are headquartered in the United States. Flowserve relies on *Tendeka, Inc. v. Glover* to argue that this forum has a strong interest in resolving this dispute because Flowserve's principal place of business is in Texas. No. H-13-1764, 2014 WL 978308, at

*11 (S.D. Tex. Mar. 12, 2014) (Rosenthal, J.).  However, in *Tendeka*, the litigants entered

into a contract that called for litigation in Texas under Texas law.  *Id.*  Here, although

Flowserve's principal place of business is in Texas, the claims in this suit are non-

contractual, which means the parties did not designate a forum, much less the applicable

law.

 The Court finds that Russia has a greater interest than Texas in resolving this

dispute.

### III. Governing Law

 Flowserve brings a claim for federal copyright infringement and state-law claims

for conversion, replevin, misappropriation of trade secrets, tortious interference with

contractual relations, and tortious interference with prospective contractual relations.  The

parties dispute whether Russian law or Texas law will apply to Flowserve's tort claims.

They also dispute whether U.S. copyright law will apply.

 "For both tort and contract cases, Texas follows the 'most significant relationship

test' set out in the Restatement (Second) of Conflict of Laws § 6 and § 145." *DTEX*, 508

F.3d at 802. "Some relevant factors to consider include (a) the place where the injury

occurred; (b) the place where the conduct causing the injury occurred; (c) the domicile,

residence, nationality, place of incorporation and place of business of the parties; and the

place where the relationship, if any, between the parties is centered." *Id.* (quotations

omitted).  The inquiry turns on the qualitative nature of the contacts, not the number of

contacts.  *Gutierrez v. Collins*, 583 S.W.2d 312, 318 (Tex. 1979).

 Russia has the most significant relationship to this case based on the claims

Flowserve lost employees, its Drawings, and proprietary training information when its

Russian employees resigned and joined ITT in Russia.  Complaint ¶¶ 19, 32.  Although

Flowserve and Defendants are U.S. corporations, they conduct extensive global business,

in Russia and elsewhere.  *See id.* ¶¶ 1, 12, 16, 31, 63. Most importantly, the relationship

between the parties is centered in Russia, where the set of events giving rise to this

litigation took place.

Flowserve argues that it was deprived of revenue in the U.S. when the Vankor

contract was not renewed, that it suffered injury here when Mikhailichenko downloaded

the Drawings from Flowserve's server in Michigan, that the training took place in the

Netherlands, and that ITT, in the United States, refused to return the Drawings.  Yet, the

misconduct in this case occurred when Mikhailichenko illegally copied the Drawings and

the trainees departed for ITT, all of which happened in Russia.  *See* Complaint ¶¶ 32, 62–

66.  It will always be the case that U.S. companies doing business abroad will suffer a

loss of revenue in the U.S.  The deprivation of revenue is not material to the analysis,

especially when the source of the lost revenue is the failed contract negotiations with

Russian companies, Neftegazholding and Vankor.  *See id.* ¶ 15.

Flowserve argues federal law governs its copyright claim because Mikhailichenko

copied the Drawings from the Michigan server.  It also asserts that there is no choice-of-

law analysis for this Court to conduct because Flowserve has plainly pleaded a claim for

copyright infringement under 17 U.S.C. § 501.  Defendants argue that the law that applies

is the law of the place where the copyright infringement occurred.

On issues of infringement, "the governing conflicts principle is usually *lex loci*

*delicti*, the doctrine generally applicable to torts."  *Itar-Tass Russian News Agency*, 153

F.3d at 91; *see also Edmark Indus. SDN. BHD. v. South Asia Int'l (H.K.) Ltd. et al.*, 89

F.Supp.2d 840, 844 (E.D. Tex. 2000) ("[O]wnership is determined by the law of the country in which the work is created but infringement is governed by the law where the infringement took place.").  Here, Flowserve alleges that ITT willfully infringed Flowserve's copyright by importing, copying, and distributing the Drawings without authorization from Flowserve.  Complaint ¶ 58.  Flowserve additionally alleges that ITT indirectly infringed Flowserve's copyright by inducing Mikhailichenko and the other ex-Flowserve employees hired by ITT to infringe Flowserve's copyrights.  *Id.*  ITT hired Mikhailichenko, who allegedly copied and distributed the Drawings without Flowserve's authorization.  Although it is true that the Drawings were downloaded from Flowserve's server in Michigan, it was Mikhailichenko's copying and distribution, not the downloading, that constituted infringement.  According to Flowserve's allegations as stated in its Complaint, the infringement allegedly occurred in Russia, and therefore, Russian law likely applies to its copyright claim.[14]

Flowserve concludes that, even if Russian law applies, "the need to apply foreign law is not in itself enough reason to apply the doctrine of forum non conveniens."  *See Schexnider v. McDermott Int'l, Inc.*, 817 F.2d 1159, 1163 (5th Cir. 1987).  As already discussed, this factor *and* other private and public factors suggest this case should be dismissed in favor of a Russian forum that can more ably apply Russian law.

---

[14] The Fifth Circuit has also found no conflict arises out a party's copyright infringement claims where the two forums are signatories to the Universal Copyright Convention and the Berne Convention for the Protection of Literary and Artistic Works.  *See Indusoft, Inc.*, 560 F. App'x at 250.  Those agreements commit each country to apply foreign copyright law when required. *See Itar–Tass Russian News Agency*, 153 F.3d at 90–91.  Therefore, at a minimum, Russia has committed itself to applying U.S. copyright law.  That one of Flowserve's claims may apply U.S. law does not change the Court's analysis.

### IV.    Burden on the Citizens

The resolution of this dispute will involve significant translation and therefore will pose a significant burden on the citizens of this forum.  "Jury duty should not be imposed on the citizens of Texas in a case that is so slightly connected with this state." *DTEX*, 508 F.3d at 803.  Defendants argue that Texas has no relevant connection to this case, and it would be unfair to ask residents to serve as jurors in a case that is overwhelmingly centered in Russia.  Flowserve counters that the fact that some events took place in Russia, and some witnesses reside in Russia, does not center this dispute there, especially where both parties are U.S. companies and Flowserve is headquartered in Texas.

Because the employees who feature in this action are Russian and the dispute centers on a maintenance contract with a Russian oil and gas company, Vankor, the Court finds that Russia has a far greater interest in this matter than Texas.  *See DTEX*, 508 F.3d at 803 (finding that Mexico had a far greater interest in the dispute than Texas).

## VI.  CONCLUSION

The Court finds that Russia is an adequate and available forum, and both the private and public interest factors support dismissal of this case on forum non conveniens grounds.

## VII.   ORDER

Defendants' Motion to Dismiss is **GRANTED**.  This case is dismissed on the grounds of forum non conveniens under the following conditions: [15]

1.   Defendants shall submit to the jurisdiction of the courts of Russia;

2.   Defendants stipulate to the following as a condition of dismissal:

   a.   Defendants will return or destroy any Flowserve drawings or training materials it possesses that are related to the Vankor pumps; and

   b.   Defendants promise not to use or disclose the contents of such drawings or training materials, except in defense of the litigation.

3.   Defendants shall comply with the following: [16]

   a.   Provide a full Rule 34 production in response to the ten requests for production Flowserve previously served;

   b.   Provide their objections to Flowserve;

   c.   Provide responsive e-mails in accordance with the parties' agreed-upon search terms, in addition to e-mails ITT has already identified as responsive.

   d.   Permit Flowserve to request review of five additional ITT email custodians within 10 days after ITT's document production is complete;

---

[15] *See In re Union Carbide Corp. Gas Plant Disaster at Bhopal, India in December, 1984*, 634 F.Supp. 842, 867 (S.D.N.Y. 1986), *aff'd as modified*, 809 F.2d 195 (2d Cir.1987) (dismissing on forum non conveniens grounds on the conditions that defendant consent to jurisdiction in India, satisfy any judgment rendered by Indian courts, and subject itself to discovery under the Federal Rules of Civil Procedure).  The Court has authority to condition its dismissal because it has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331, 1332, and 1338.  *See Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 127 S.Ct. 1184, 1193–94 (2007) (declining to consider whether a court must first establish its own jurisdiction before conditioning a *forum non conveniens* dismissal on the waiver of jurisdictional defenses).

[16] The Court orders the production of these documents in an effort to permit Flowserve to prove damages in the Russian forum.  *See supra* p. 12; Pl.'s App. 166 (Gavrilov Op.) (discussing the difficulty of obtaining documents in Russia to prove damages).

    e.   Provide a privilege log that identifies any responsive documents withheld under a claim of privilege, either under U.S. or Russian law.

    f.   Satisfy any judgment rendered by a Russian court.

4.   Flowserve shall not be required to produce documents or discovery.

5.   The Court will rule on any "proprietary information" objections by Defendants if such objections are made.

6.   The Court will rule on any objections by Defendants that Russian law prohibits the production of certain documents if such objections are made.

7.   The Court retains jurisdiction and venue to enforce these conditions until dismissal on April 15, 2015.

      **SO ORDERED.**

      December 22, 2014.

 

**BARBARA M. G. LYNN**
**UNITED STATES DISTRICT JUDGE**
**NORTHERN DISTRICT OF TEXAS**